**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

**BRETT P.,**

                           **Plaintiff,**

**v.**                                                    **1:18-CV-01395 (NAM)**

**COMMISSIONER OF SOCIAL SECURITY,**

                           **Defendant.**

_____

**Appearances:**

Josephine Gottesman
Dennis Kenny Law
288 North Plank Road
Newburgh, New York 12550
_Counsel for Plaintiff_

Joshua L. Kershner
Social Security Administration
Office of Regional General Counsel - Region II
26 Federal Plaza - Room 3904
New York, New York 10278
_Counsel for Defendant_

**Hon. Norman A. Mordue, Senior United States District Court Judge**

**MEMORANDUM-DECISION AND ORDER**

**I.**      **INTRODUCTION**

      Plaintiff Brett P. filed this action under 42 U.S.C. § 405(g) and 1383(c)(3), challenging

the denial of his application for Social Security Disability ("SSD") insurance benefits. (Dkt.

No. 1). The parties' briefs are presently before the Court. (Dkt. Nos. 11, 18). After carefully

reviewing the administrative record, (Dkt. No. 8), and considering the parties' arguments, the

Court reverses the denial decision and remands for further proceedings consistent with this Order.

## II.     BACKGROUND

### A.     Procedural History

Plaintiff applied for disability benefits in May 2015, alleging that he had been disabled since August 1, 2013.  (R. 11).  Plaintiff claims he is disabled due to Stickler syndrome, hearing loss, irritable bowel syndrome, and depression.  (R. 507).  The Social Security Administration ("SSA") denied Plaintiff's application on August 20, 2015.  (R. 364–79).  Plaintiff appealed that determination and requested a hearing before an Administrative Law Judge ("ALJ").  (R. 394–95).  The hearing was held on August 2, 2017 before ALJ Asad M. Ba-Yunus.  (R. 274–355).  At this hearing, Plaintiff appeared and testified, as did a Vocational Expert ("VE").  (*Id.*).  On October 20, 2017, the ALJ issued a decision finding that Plaintiff was not disabled.  (R. 11–21).  Plaintiff's subsequent request for review by the Appeals Council was denied on October 2, 2018.  (R. 1–7).  Plaintiff then commenced this action on November 30, 2018.  (Dkt. No. 1).

### B.     Plaintiff's Background and Testimony

Plaintiff was born in 1983.  (R. 19).  He graduated from high school and went on to study piano and psychology in college.  (R. 19, 309–10).  Plaintiff attended graduate school for a year and a half where he studied vocational rehabilitation.  (R. 1319).  Plaintiff was unable to complete the program due to his medical conditions.  (R. 294–95).

Plaintiff testified that in 2007-2008 he started to get tendinopathies all over his body, including his hands, which made using a computer difficult.  (R. 299–301).  Plaintiff testified that he also started experiencing pain in his neck, arms, and groin.  (R. 301–02).  Plaintiff

became frustrated when his doctors were unable to diagnose his condition. (R. 301). Plaintiff testified that he would start jobs but then would be forced to quit or be fired as a result of the pain caused while performing his job duties. (R. 304). He stated that he became "horribly depressed because I couldn't figure out what was wrong with me." (R. 310). Plaintiff was ultimately diagnosed with a connective tissue disorder associated with Stickler syndrome. (R. 309).

To treat his chronic pain, Plaintiff received prolotherapy injections to stimulate his connective tissue and strengthen his joints. (R. 311). These injections allowed him to continue his education and attend graduate school for a brief time. (R. 292, 311). While he was interning during his graduate studies, Plaintiff's tendinopathies worsened and affected his hands, shoulders, and the back of his neck. (R. 312–13). Plaintiff testified that his pain symptoms, along with fatigue and exhaustion, forced him to quit the internship and withdraw from doing anything because he was immobile and he was afraid of hurting himself. (*Id.*). He continued with the prolotherapy injections and was prescribed Fentanyl and Hydrocodone, but his condition continued to worsen. (R. 316). Plaintiff testified that he has tried various pain medicines but has been unable to achieve relief. (*Id.*)

Plaintiff asserts that his nervous system was impaired causing "brain zaps," shortness of breath, sweating with the smallest amount of heat, nausea, increased sensitivity to light and sound. (R. 316–17). Plaintiff reported the he underwent a surgical procedure that further worsened his condition. (R. 318). He testified that after his surgery he suffered from an increasing number of flare-ups and his relationship with his parents deteriorated due to his growing dependence on them. (R. 321–22). Plaintiff claims that his parents "had [him] committed" to Albany Medical Center. (R. 318–19).

Plaintiff stated that when he was released from Albany Medical Center, he went to live in a motel. (R. 322). Plaintiff testified that he continues to have chronic pain and that he has difficulty focusing when people speak to him. (R. 322–23). He estimated he would have to stop to rest after walking sixty to seventy yards. (R. 324). Plaintiff stated that repetitive use of his hands continues to cause pain. (*Id.*). He stated that he can only drive short distances in a car. (R. 325). Plaintiff said he must set aside twelve hours each day to sleep because he cannot sleep for extended periods of time and wakes up "exhausted, feeling like [you] just ran a marathon when [you] just had 10 hours of sleep." (*Id.*). Plaintiff asserts that his prescribed medication has resulted in weight gain, dizziness, and memory problems. (R. 325–26).

Plaintiff reported that he lived with his parents for some time, but recently moved into an apartment. (R. 288). Plaintiff stated that his parents prepare most of his meals because repetitive motions such as chopping and stirring cause him pain. (R. 526). Plaintiff stated that he has no problems with personal care. (R. 524). He said he can "only lift light items" and must "limit standing because of sciatic pain." (R. 529). He reported that "sitting too long can cause sciatica" and that he "can climb stairs but not frequently." (*Id.*). Plaintiff stated that he spends his days reading, watching television, and listening to music. (R. 527). Plaintiff uses hearing aids, contact lenses, and hand splints. (R. 530). He reported that he has no problems getting along with others and noted that stress or changes in schedule can cause him difficulty completing tasks. (R. 530–31).

### C. Medical Evidence of Disability

Plaintiff's disability claim stems from complaints of widespread joint pain, mobility issues, chronic and severe neck pain, muscle spasms, constant fatigue, sensorineural hearing loss, irritable bowel syndrome, spine problems, and leg and foot issues. (Dkt. No. 11, p. 13).

He also reports suffering from anxiety, depression, agitation, impaired attention span, sleep problems, and suicidal ideation. (*Id.*). Plaintiff claims that he has struggled with these conditions since 2008 and has received treatment from a number of medical providers.

## 1. Hearing Loss

Plaintiff began receiving treatment for ear and hearing problems in 2008, which led to multiple surgeries for tympanostomy between 2011 and 2015. (*See generally* R. 747–887). Plaintiff has worn hearing aids since 2008. (R. 749). In 2013, test results showed chronic bilateral sensorineural hearing loss that was "moderate to severe" in the right ear and "mild to moderately severe" in the left ear. (R. 846).

## 2. Chronic Pain

### a. Dr. Mikhail Strut

In November 2013, Plaintiff presented to Dr. Mikhail Strut for treatment of his chronic pain symptoms. (R. 918–20). Plaintiff reported that he had generalized pain throughout his body for many years and had previously been treated with prolotherapy by another doctor. (R. 918). Plaintiff reported that his current pain was a six on a ten-point scale but noted that it typically ranged anywhere between a five and a ten. (*Id.*). Dr. Strut diagnosed Plaintiff with: chronic cervical spine pain; cervical ligamentous dysfunction; cervical muscle spasm; cervical enthesopathy; cranio-cervical headaches; lumbar enthesopathy; lumbar muscle spasms; sacroiliitis; and chronic lumbar pain. (R. 919). Over the next several years, Dr. Strut treated Plaintiff's pain symptoms with prolotherapy injections throughout his body. (*See generally* R. 889–928). Dr. Strut's treatment records frequently note Plaintiff's depressed mood and flat affect. (*See e.g.*, R. 899, 912, 921).

### b. Dr. Howard Philip Levy

In April 2015, Plaintiff was seen by Dr. Howard Philip Levy at Johns Hopkins Medical Center for a genetic evaluation for Ehlers Danlos syndrome and Stickler syndrome. (R. 930–35). Dr. Levy diagnosed Plaintiff with Stickler syndrome based on "[h]is personal and family history of sensorineural hearing loss and high myopia, combined with his flat facial profile, very high/narrow palate, submucous cleft palate, and aches [and] pains . . . ." (R. 933). With regard to Plaintiff's pain symptoms, Dr. Levy wrote that "pain is a common problem in Stickler syndrome," and noted that "there is no simple solution." (*Id.*). Dr. Levy then listed a number of recommendations that Plaintiff should follow, including: (1) avoidance of high-impact activity and resistance exercise; (2) improvement of joint stability by increasing muscle tone through low resistance exercise like walking, swimming, and yoga; (3) recognizing and not exceeding current physical limitations by minimizing resistance and avoiding excess repetition; and (4) attending physical therapy. (R. 934). Dr. Levy also diagnosed Plaintiff with asthma and congenital bilateral sensorineural hearing loss. (*Id.*).

### c. Dr. Manish Saha

In May 2015, Plaintiff presented to Dr. Manish Saha complaining of continued joint pain. (R. 1687–91). Dr. Saha noted that Plaintiff was in graduate school but had recently taken medical leave due to difficulties with pain and an inability to stay on top of his schoolwork. (R. 1689). Dr. Saha confirmed Plaintiff's Stickler syndrome diagnosis and also diagnosed Plaintiff with depression. (R. 1689–90). Plaintiff saw Dr. Saha again in June and July of 2015 for treatment of his pain symptoms. (R. 1678–86). Dr. Saha noted that "there is no treatment for [Stickler syndrome] other than ongoing therapy and managing symptoms."

(R. 1681). Dr. Saha prescribed a Fentanyl patch and a neck brace to help with Plaintiff's neck pain. (R. 1685).

Plaintiff continued to see Dr. Saha through March 2017 for his pain-related symptoms. (R. 1911–61). The medical records show that Plaintiff consistently complained of generalized pain symptoms and that he continued to experience fatigue and difficulty sleeping. (*See e.g.*, R. 1911, 1914, 1931–32). Dr. Saha saw Plaintiff for a preoperative visit on March 13, 2017. (R. 1959–61). Plaintiff underwent surgery for a spinal fusion surgery on March 28, 2017. (R. 1973–41). After the operation, Plaintiff continued to complain of the same symptoms he had prior to the surgery. (R. 1983–84). Doctors determined that Plaintiff might also benefit from additional surgery to fuse other areas of his spine. (*Id.*).

### d. Dr. Ernest Enzien

In June 2016, Plaintiff was seen by Dr. Ernest Enzien for his primary care. (R. 1764–67). Dr. Enzien reported that Plaintiff suffered from Stickler syndrome, depression and anxiety and noted that his prognosis was "guarded." (R. 1764). Plaintiff suffered from pain in all of his joints that worsened for no apparent reason. (*Id.*). Plaintiff reported that his pain was generally a six or seven on a ten-point scale. (*Id.*). Dr. Enzien noted that Plaintiff's condition would be expected to last more than twelve months and that Plaintiff's depression and anxiety were affecting his physical condition. (*Id.*). Dr. Enzien noted that Plaintiff suffered from muscle weakness and chronic pain and fatigue. (R. 1765). He also determined that Plaintiff had "significant limitations" with reaching, handling, and fingering. (R. 1766). Dr. Enzien also found Plaintiff's condition would cause him to be off-task for at least 25 percent of the workday and would also cause him to be absent from work more than four days per month. (R.

1767). Dr. Enzien added that Plaintiff's anxiety and pain would trigger work stress and would cause him difficulty completing tasks and reduce his focus. (*Id.*).

### 3. Psychiatric Treatment

#### a. Kevin Pertchik, Ph.D.

Plaintiff was treated by Dr. Kevin Pertchik at Saratoga Psychological Associates from 2011 through 2016. (R. 1657–58, 1744–51). In August 2015, Dr. Pertchik completed a treatment summary noting that Plaintiff suffered from "anxiety over several health issues as well as his career choices." (R. 1657). Dr. Pertchik noted that Plaintiff had been "highly fearful that his physical problems[,] weak connective tissue and joints[,] will greatly limit him from completing an internship and fulfilling his career goals." (*Id.*). He noted that Plaintiff "has some physical limitations that at least temporarily limit his ability to work." (R. 1658). Dr. Pertchik found that Plaintiff's prognosis was "fair," and assessed that "[Plaintiff's] health-related general anxiety worries magnify his actual health problems." (*Id.*). He added that Plaintiff "has been caught in a vicious cycle of worry and that cycle needs to be mitigated more successfully for him to maximize his physical potential. (*Id.*).

In May 2016, Dr. Pertchik completed a Medical Source Statement. (R. 1744–51). Dr. Pertchik described Plaintiff's prognosis as "fair to poor," and explained that Plaintiff experiences "daily negative thinking" and is "obsessive about [his] health problems [which] result in poor concentration and suicidal ideation." (R. 1744). Dr. Pertchik opined that Plaintiff's "attendance and ability to complete a workweek are severely limited" by his chronic pain. (R. 1746). He reported that Plaintiff suffered from "daily pain which is exacerbated by anxiety and depression," and assessed that "stress may trigger [Plaintiff's] depression [and] anxiety [and] exacerbate pain." (R. 1747). With regard to Plaintiff's ability work at a regular

8

job on a sustained basis, Dr. Pertchik noted that "attendance may be a problem due to [Plaintiff's] frequent hospitalization [and] chronic health flare-ups." (R. 1751). He assessed that Plaintiff's ongoing medical conditions would likely cause him to be absent from work more than four days per month. (R. 1749).

### b. Elena Yakunina, Ph.D.

Plaintiff saw Dr. Elena Yakunina for treatment of his mental health issues on 30 different occasions from October 2013 through February 2015. (*See* R. 1639–56). In June 2015, Dr. Yakunina completed a treatment summary describing Plaintiff's treatment history with her. (R. 1316–24). Dr. Yakunina's notes indicate that Plaintiff first "presented with major depressive disorder and academic/occupational concerns secondary to a chronic medical condition." (R. 1319). Dr. Yakunina reported that during Plaintiff's second year of graduate school his pain condition "started to deteriorate and seemed to no longer respond to the prolotherapy injections he was receiving." (*Id.*). Dr. Yakunina noted Plaintiff's increasing pain forced him "to withdraw from his internship and take a medical leave of absence from his graduate program and move[] back home with his parents for medical care." (*Id.*).

Dr. Yakunina reported that Plaintiff "experienced significant hopelessness, powerlessness, and depression due to his medical condition which restricted his ability to develop professionally and socially and to function on his own." (R. 1319). Plaintiff was prescribed Cymbalta and Wellbutrin to help manage his symptoms of depression. (R. 1316). Dr. Yakunina noted that Plaintiff's chronic pain and depression interfere with his "ability to interact effectively with coworkers," and with this "performance of routine work, related tasks, and interferes with [his] concentration." (R. 1317). She also stated that Plaintiff's condition "interferes with traveling to work, maintaining a regular work schedule, sitting, typing, or

writing for sustained period of time." (R. 1318). Plaintiff's treatment with Dr. Yakunina ended in February 2015 after Plaintiff withdrew from his graduate program and returned to Albany to live with his parents. (R. 1319).

### c. Dr. Naveen Achar

On May 7, 2015, Plaintiff saw Dr. Naveen Achar for treatment for depression. (R. 1114–17). Plaintiff reported that he was in pain from his Stickler syndrome which had reduced his quality of life and prevented him from doing normal activities. (R. 1114). Dr. Achar noted Plaintiff's flat affect and reported that Plaintiff "seem[ed] preoccupied with his pain issues." (R. 1116). Dr. Achar prescribed Cymbalta, Xanax, and Ambien and suggested psychiatric hospitalization. (R. 1117).

On May 26, 2015, Plaintiff was admitted to Albany Medical Center complaining of diffuse pain, hopelessness, and suicidal ideation. (R. 1132). He was discharged the same day after adjustments were made to his medications. (*Id.*). Plaintiff was admitted to Albany Medical Center again on May 28, 2015 for twelve days for treatment of his depression. (R. 1659, 1668). Plaintiff was also admitted to Albany Medical Center in October 2016 for unspecified depressive disorder. (R. 1773–81).

### d. Four Winds Saratoga

In November 2015, Plaintiff was admitted to Four Winds Saratoga for treatment of anxiety, depression, possible thought disorder, intrusive suicidal ideation, with a recent panic attack over not being able to continue his academic program and maintain employment. (*See* R. 1720–31). Plaintiff was diagnosed with major depressive disorder, anxiety disorder, and alcohol abuse. (R. 1722). Plaintiff had active suicidal ideation, impaired attention span, racing thoughts, and poor impulse control. (R. 1727–30).

Plaintiff was admitted to Four Winds again in January 2016 to address ongoing depression, anxiety, and suicidal ideation. (R. 1732–43). Plaintiff reported that his diagnosis of Stickler syndrome was his primary stressor. (R. 1732). Plaintiff underwent eight electroconvulsive therapy ("ECT") treatments with positive results. (R. 1733).

Plaintiff was also admitted to Four Winds in November 2016 with reported feelings of apathy and hopelessness about his situation. (R. 1782–94). Treatment notes indicate that Plaintiff had become suicidal and severely depressed due to chronic neurological issues causing him extreme pain. (R. 1782). Plaintiff underwent another eight-course series of ECT treatments with positive results. (R. 1784).

#### 4. Consultative Evaluations

#### a. Dr. Kautilya Puri, Physical Examiner

In July 2015, Plaintiff presented to Dr. Kautilya Puri for a consultative physical examination. (R. 1631–34). Plaintiff reported that his primary complaints were lower back pain and joint pain all over his body which were sharp and increase with movement. (R. 1631). Dr. Puri noted Plaintiff's history of depression, anxiety, and Stickler syndrome with congenital hearing loss and joint pains. (*Id.*). She observed that Plaintiff did not appear to be in acute distress, had normal gait, could stand on his heels and toes, had a normal stance, could rise from a chair without difficulty, and needed no help changing for the exam or getting on and off the exam table. (R. 1632). She noted that Plaintiff's straight leg raise was negative bilaterally, that he had full flexion in his cervical spine, and that he had full rotary movement bilaterally. (R. 1633). She found that he had full range of motion in his shoulders, arms, hips, knees, and ankles. (*Id.*). Dr. Puri noted that Plaintiff had no sensory deficits, full strength in his upper and lower extremities, and had intact hand and finger dexterity with full grip

strength. (*Id.*). Plaintiff reported that he can do some cooking, cleaning, laundry, and shopping. (R. 1632). He stated that he could shower, bathe, and dress without assistance. (*Id.*).

Dr. Puri's medical source statement concluded that:

> The [Plaintiff] did not have any objective limitations to communication, fine motor, or gross motor activity. [Plaintiff] had mild limitations to his gait and to his activities of daily living on examination today with mild limitations to squatting, bending, stooping, kneeling, and overhead reaching and moderate limitations to lifting weights. It is recommended that he not carry out strenuous activity or be in an environment which increases respiratory complaints. It is recommend that [Plaintiff] be seen by a psychologist.

(R. 1634).

### b. Marvella Bowman, Ph.D., Psychiatric Examiner

In July 2015, Plaintiff presented to Marvella Bowman, Ph.D. for a psychiatric evaluation. (R. 1625–29). Plaintiff reported that he was able to manage his own money, drive, and take public transportation if needed. (R. 1628). He stated that he was able to dress, bathe, and groom himself, cook and prepare food, and engage in general cleaning. (*Id.*).

Dr. Bowman noted that Plaintiff endorsed difficulty falling asleep and described his depressive symptomatology including: dysphoric mood, crying spells, worthlessness, diminished self-esteem, hopelessness, concentration difficulties, loss of usual interest, concentration difficulties, loss of usual interest, irritability, and social withdrawal. (R. 1626). Plaintiff endorsed anxiety-related symptomology including: excessive apprehension and worry, restlessness, difficulty concentrating, irritability, flashbacks, fearfulness of abandonment by his parents, and concerns about his future health. (*Id.*). Plaintiff denied any thought disorder issues, cognitive deficits, suicidal ideation, or any manic symptomology. (*Id.*). Dr. Bowman

noted that Plaintiff's thought processes were coherent and goal directed with no evidence of hallucinations, delusions, or paranoia. (R. 1627). She noted that his affect was "somewhat restricted and flat," and that his mood was "apathetic." (*Id.*). She found that Plaintiff's insight and judgment were good and that his intellectual functioning appears "within the average range." (R. 1627–28).

Dr. Bowman's medical source statement concluded that:

> The claimant displays no limitations following and understanding simple directions and instructions, performing simple tasks independently, maintaining attention and concentration, maintaining a regular schedule, learning new tasks, performing complex tasks independently, and making appropriate decisions. The claimant displays moderate limitations relating adequately with others and appropriately dealing with stress. These difficulties are caused by symptoms of depression and anxiety.
>
> The results of the present evaluation appear to be consistent with psychiatric problems, and this may significantly interfere with the claimant's ability to function on a daily basis.

(R. 1628). She found that Plaintiff's prognosis was "fair given the current treatment in place," and recommended that Plaintiff obtain group therapy and continue with psychological and psychiatric treatment as currently provided. (R. 1629).

### D. ALJ's Decision Denying Benefits

On October 20, 2017, the ALJ issued a decision denying Plaintiff's application for disability benefits. (R. 11–21). At step one of the five-step evaluation process, the ALJ determined that Plaintiff had not engaged in any substantial gainful activity since August 1, 2013, the alleged onset date of his disability. (R. 13).

At step two, the ALJ found that, under 20 C.F.R. § 404.1520(c), Plaintiff had three "severe" impairments: Stickler/Ehler-Danlos syndrome, hearing loss, and depression. (R. 14).

13

At step three, the ALJ found that, while severe, Plaintiff did not have an impairment or combination of impairments that met the criteria for one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526). (R. 14–15).

Before proceeding to step four, the ALJ assessed Plaintiff's residual functional capacity ("RFC"), finding that:

> [Plaintiff] has the [RFC] to perform light work as defined in 20 CFR 404.1567(b) except he may frequently balance, crawl, climb ramps, stairs, ladders, ropes, and scaffolds. He can perform no more than occasional stooping, kneeling and crouching, can frequently handle, finger, and feel with the left upper extremity, and occasionally reach overhead bilaterally. The claimant has diminished hearing and requires no more than a moderate noise level environment. Additionally, he can tolerate only occasional changes to a routine work setting, frequent interaction with supervisors, coworkers and the public, and would be off task no more than five percent of an eight-hour workday.

(R. 15). The ALJ's supporting analysis explains that he reached this determination based primarily on the opinions of Drs. Bowman, Bruni, Puri, and Enzien. (*See* R. 15–19).

At step four, the ALJ determined that Plaintiff would be unable to perform any of his past relevant work because the demands of his past relevant work would exceed the demands of light work as assessed in the ALJ's RFC determination. (R. 19).

At step five, despite Plaintiff's inability to perform any of his past relevant work, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. (R. 19–21). Specifically, based on Plaintiff's age, education, job skills, and work experience, as well as testimony from the vocational expert, the ALJ found that Plaintiff would be able to work as a cashier, a cleaner/housekeeper, or a photocopy machine operator. (*See id.*).

## III.   DISCUSSION

### A.  Disability Standard

To be considered disabled, a claimant must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).  In addition, the claimant's impairment(s) must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 1382c(a)(3)(B).

The SSA uses a five-step process to evaluate disability claims:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him [*per se*] disabled . . . .  Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Selian v. Astrue*, 708 F.3d 409, 417–18 (2d Cir. 2013) (quoting *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)); *see also* 20 C.F.R. § 404.1520.  The Regulations define residual functional capacity as "the most [a claimant] can still do despite [their] limitations." 20 C.F.R. § 404.1545.  In assessing the RFC of a claimant with multiple impairments, the SSA considers

all "medically determinable impairments," including impairments that are not severe. *Id.* § 404.1545(a)(2). The claimant bears the burden of establishing disability at the first four steps; the Commissioner bears the burden at the last. *Selian*, 708 F.3d at 418.

### B. Standard of Review

In reviewing a final decision by the Commissioner under 42 U.S.C. § 405, the Court does not determine *de novo* whether Plaintiff is disabled. Rather, the Court must review the administrative record to determine whether "there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009).

When evaluating the Commissioner's decision, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Selian*, 708 F.3d at 417 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983)). The Court may set aside the final decision of the Commissioner only if it is not supported by substantial evidence or if it is based upon a legal error. 42 U.S.C. § 405(g); *Selian*, 708 F.3d at 417; *Talavera*, 697 F.3d at 151. "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447–48 (2d Cir. 2012) (quoting *Moran*, 569 F.3d at 112). The substantial evidence standard is "very deferential," and the Court may only reject the facts found by the ALJ "if a reasonable factfinder would *have to conclude otherwise*." *Id.* at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)).

Consequently, "[e]ven where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings 'must be given conclusive

effect' so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (quoting *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982)).

### C. Analysis

In challenging the Commissioner's denial decision, Plaintiff argues that the RFC was not supported by substantial evidence because the ALJ "picked and chose bits and pieces of the medical evidence that supported his decision, and ignored or misconstrued the parts of the medical evidence that supported Plaintiff's claims." (Dkt. No. 11, p. 25). Specifically, Plaintiff challenges the ALJ's finding that Plaintiff would be off task for no more than five percent of an eight-hour workday. (*Id.*). Plaintiff asserts that there is "not one shred of evidence to support this conclusion," and he cites contrary evidence from his treating providers that support his claim that his medical conditions prevent him from remaining on task and maintaining acceptable work attendance. (*Id.*, pp. 25–26).

In response, the Commissioner asserts that the ALJ properly evaluated the opinion evidence in the record. (Dkt. No. 18, pp. 11–22). Specifically, the Commissioner claims that the ALJ's reliance on non-treating, non-examining physicians and psychologists was proper because those opinions are consistent with other medical evidence in the record. (*Id.*, pp. 20–22). The Commissioner claims that the ALJ considered all of the opinion evidence from Plaintiff's treating physicians and properly incorporated it into the RFC determination. (*Id.*, p. 21). In sum, the Commissioner argues that although the "RFC does not exactly mirror any one opinion, it reflects the evidence as a whole and the resulting RFC is supported by substantial evidence." (*Id.*).

In deciding a disability claim, an ALJ is tasked with "weigh[ing] all of the evidence available to make an RFC finding that [is] consistent with the record as a whole," even if that

finding does not perfectly correspond with any of the opinions of cited medical sources. *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013). However, an ALJ is not a medical professional, and "is not qualified to assess a claimant's RFC on the basis of bare medical findings." *Ortiz v. Colvin*, 298 F. Supp. 3d 581, 586 (W.D.N.Y. 2018). In other words, there must be substantial evidence to support a finding of functional limitations or lack thereof.

Relatedly, under the treating physician rule, an ALJ owes "deference to the medical opinion of a claimant's treating physician[s]." *Church v. Colvin*, 195 F. Supp. 3d 450, 453 (N.D.N.Y. 2016) (citing *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)). However, "[w]hen a treating physician's opinion is not consistent with other substantial evidence in the record, such as the opinions of other medical experts, . . . the hearing officer need not give the treating source opinion controlling weight." *Id.* When a treating physician's opinions are disregarded, the ALJ must provide "good reasons" for doing so. *See* 20 C.F.R. § 404.1527(d). Indeed, the Second Circuit has instructed that courts should "not to hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion" or when the ALJ's opinion does not "comprehensively set forth reasons for the weight assigned to a treating physician's opinion." *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004).

Recently, in *Estrella v. Berryhill*, the Second Circuit reiterated its mandate that ALJs must follow specific procedures in determining the appropriate weight to assign a treating physician's opinion. *See generally* 925 F.3d 90, 95–98 (2d Cir. 2019). The Circuit described the applicable standard, writing that:

> First, the ALJ must decide whether the opinion is entitled to controlling weight. "[T]he opinion of a claimant's treating physician as to the nature and severity of [an] impairment is given 'controlling weight' so long as it 'is well-supported by medically

acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess*, 537 F.3d at 128 (third brackets in original) (quoting 20 C.F.R. § 404.1527(c)(2)). Second, if the ALJ decides the opinion is not entitled to controlling weight, it must determine how much weight, if any, to give it. In doing so, [the ALJ] must "explicitly consider" the following, nonexclusive "*Burgess* factors": "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (per curiam) (citing *Burgess*, 537 F.3d at 129 (citing 20 C.F.R. § 404.1527(c)(2))). At both steps, the ALJ must "give good reasons in [its] notice of determination or decision for the weight [it gives the] treating source's [medical] opinion." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (per curiam) (quoting 20 C.F.R. § 404.1527(c)(2)).

*Id.* at 95–96. The Circuit also noted that "[a]n ALJ's failure to 'explicitly' apply the Burgess factors when assigning weight at step two is a procedural error." *Id.* (citing *Selian*, 708 F.3d at 419–20). "If 'the Commissioner has not [otherwise] provided 'good reasons' [for its weight assignment],' we are unable to conclude that the error was harmless and consequently remand for the ALJ to 'comprehensively set forth [its] reasons.'" *Id.* (citing *Halloran*, 362 F.3d at 32–33).

Upon review of the record, the Court finds that the ALJ's conclusion that Plaintiff "would be off task no more than five percent of an eight-hour workday" is not supported by substantial evidence. (*See* R. 15). In fact, the ALJ's determination as to Plaintiff's estimated time "off task" is directly contrary to the opinions of all of Plaintiff's treating physicians, including Drs. Yakunina, Pertchik, and Enzien. Specifically, Dr. Yakunina reported in July 2015 that "[t]he primary impairment in Plaintiff's situation is due to his severe and chronic pain," which would prevent him from being able to "sit, type, write, or preform repetitive movements with his hands which in combination makes it difficult for him to work." (R.

1641).  Dr. Yakunina also determined that Plaintiff's "severe pain is also distracting and prevent[s] him from being able to concentrate on tasks or interact with others appropriately." (*Id.*).  She concluded that "[Plaintiff's] depression is caused by the limitations imposed by his medical condition and the experience of debilitating chronic pain on a daily basis," and noted that his conditions "severely impair[] his ability to work."  (R. 1641–42).  She assessed that Plaintiff would have "extreme" difficulties with concentration, persistence and pace, and would likely be absent from work more than four days per month.  (R. 1643–44).  Notably, Dr. Yakunina's observations were based on 30 individual counseling sessions between October 2013 and February 2015.  (R. 1639).

The ALJ appears to discredit Dr. Yakunina's assessment because Plaintiff was enrolled in a graduate program at the time her opinion was rendered—a fact the ALJ found "suggests a higher level of functioning and tends to lessen the persuasiveness of [Dr. Yakunina's] opinion."  (*See* R. 17).  The ALJ fails to mention, however, that Plaintiff withdrew from that graduate program because of his continued struggle with chronic pain and mental health issues. (*See* R. 294–95, 1319–20, 1639).  Treatment notes from Plaintiff's treating providers show that Plaintiff's chronic pain caused by Stickler syndrome is the primary source of his depression and anxiety.  (*See e.g.*, R. 1316–18, 1392–93, 1744).

Significantly, Dr. Yakunina's opinions are consistent with Dr. Pertchik's May 2016 assessment, in which Dr. Pertchik opined that "[d]ue to physical pain and recurrent injuries from his well documented Sticklers syndrome, [Plaintiff's] attendance and ability to complete a workweek are severely limited."  (R. 1746).  Dr. Pertchik also found that Plaintiff's medical conditions would cause him to be absent from work "more than four days per month," and that Plaintiff's "obsess[ion] about health problems result in poor concentration [and] suicidal

ideation." (R. 1744, 1749). Dr. Pertchik's assessment found Plaintiff's prognosis was "fair to poor" and notes that Plaintiff's conditions required three hospital admissions for psychiatric treatment within one year, and that "stress may trigger his depression and anxiety and exacerbate [his] pain." (R. 1747–48). With regard to working at a regular job on a sustained basis, Dr. Pertchik noted that Plaintiff's "attendance may be a problem due to frequent hospitalization and chronic health flare-ups." (R. 1751). Notably, Dr. Pertchik's assessment was based on his observations during weekly counseling sessions with Plaintiff since August 2011. (R. 1744).

Furthermore, Dr. Enzien completed a Medical Source Statement in June 2016 which also indicates that Plaintiff's medical conditions would cause him considerable difficulty maintaining a regular work schedule. (R. 1752–55). Specifically, Dr. Enzien determined that Plaintiff's symptoms would likely cause him to be off task "25 percent or more" in a typical workday and would cause him to be absent from work "more than four days per month." (R. 1755). Dr. Enzien stated that Plaintiff's conditions would cause him difficulty completing tasks and would reduce his ability to focus. (*Id.*). Dr. Enzien assessed that Plaintiff's prognosis was "guarded" and noted that Plaintiff would likely require four unscheduled breaks each day. (R. 1753).

Taken together, the opinions from Plaintiff's treating providers all flatly contradict the ALJ's finding that Plaintiff "would be off task no more than 5 percent of an eight-hour workday." (R. 15). The medical evidence shows that Plaintiff's treating providers consistently found that Plaintiff's mental and physical medical conditions would cause significant limitations to his ability to meet the demands of regular employment. (*See, e.g.*, R. 1316–20, 1392–93, 1744–51, 1752–55).

Moreover, the ALJ did not give good reasons for rejecting the opinions of Plaintiff's treating providers. Rather, the ALJ's decision relies heavily on the consultative examiners and non-examining experts, while disregarding Plaintiff's treating providers' opinions that his conditions caused serious limitations in his ability to remain on task and meet the demands of a regular work schedule. The ALJ's decision discredits each of Plaintiff's treating providers for different reasons but appears to have cherry-picked evidence from the record that only supported his findings.[1] Further, the decision does not account for key factors that support the treating physicians' findings, particularly the extent of their treatment history with Plaintiff and the consistency among their opinions. *See Estrella*, 925 F.3d at 95–96 (citing, *inter alia*, 20 C.F.R. § 404.1527(c)(2)). Indeed, the treating providers were unanimous in their opinion that Plaintiff has significant physical and mental limitations in performing and attending work. (*See* R. 15–19). Thus, the ALJ's failure to properly address the treating physicians' opinions on these issues was error.

In sum, the Court finds that the ALJ erred in applying the treating physician rule which led the ALJ to formulate an RFC that was not supported by substantial evidence. Therefore, Plaintiff's case must be remanded for further proceedings. On remand, the Commissioner's review should focus on the impact of Plaintiff's chronic pain on his ability to consistently attend work and remain on task. At a minimum, the ALJ should review the Second Circuit's decision in *Estrella* and provide a more detailed analysis supporting his application of the

---

[1] As an example, the Court notes that the ALJ gave great weight to the consultative psychiatric examiner, Dr. Bowman. (*See* R. 15–19). Dr. Bowman found that Plaintiff's condition "appear[s] to be consistent with psychiatric problems, and this may significantly interfere with the claimant's ability to function on a daily basis." (R. 1628). However, the ALJ's decision fails to mention this important finding, and instead, only cites evidence from Dr. Bowman's report that is favorable to his ultimate conclusion. (*See* R. 17, 1625–29). The Court finds that Dr. Bowman's assessment that Plaintiff's mental impairments could "significantly interfere" with his daily functioning should have been considered in combination with the opinions of Plaintiff's treating physicians.

treating physician rule. *See Schaal v. Apfel*, 134 F.3d 496, 503 (2d Cir. 1998) ("[B]ecause . . . the ALJ . . . failed to follow SSA regulations requiring a statement of valid reasons for not crediting the opinion of plaintiff's treating physician, . . . a remand is necessary in order to allow the ALJ to reweigh the evidence."); *see also Kuhaneck v. Comm'r of Soc. Sec.*, 357 F. Supp. 3d 241, 245–48 (W.D.N.Y. 2019) (remanding for further proceedings where the ALJ rejected a detailed medical source statement from the plaintiff's treating physicians without providing sufficiently good, nonconclusory reasons for rejecting it); *Valderrama v. Comm'r of Soc. Sec.*, 379 F. Supp. 3d 141, 145–48 (S.D.N.Y. 2019) (same).[2]

## IV.    CONCLUSION

For the foregoing reasons it is

**ORDERED** that the Commissioner's decision is **REVERSED** and **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Memorandum-Decision & Order; and it is further

**ORDERED** that the Clerk of the Court is directed to close this case.

**IT IS SO ORDERED.**

Date:   January 8, 2020
         Syracuse, New York

Norman A. Mordue
Senior U.S. District Judge

---

[2] Because remand is necessary in this case, the Court declines to address the additional arguments advanced by Plaintiff in support of the same relief. *See Insalaco v. Comm'r of Soc. Sec*., 366 F. Supp. 3d 401, 410 (W.D.N.Y. 2018) (declining to reach the plaintiff's additional arguments after remanding for further administrative proceedings where the ALJ failed to properly apply the treating physician rule).